# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-00301-DME-CBS

ALCOHOL MONITORING SYSTEMS, INC., a Colorado Corporation,

     Plaintiff/Counterclaim-Defendant,

vs.

BI INCORPORATED, a Colorado Corporation,

     Defendant/Counterclaim-Plaintiff,

and

GEO CARE, INC., a Florida Corporation,

     Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT ON PATENTS '149 AND '611 AND GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT ON VALIDITY OF THE '149 PATENT

---

This order addresses two matters pending before the Court: (1) Defendants BI Incorporated and Geo Care, Inc.'s Motion for Summary Judgment of Non-Infringement (Doc. 136) (the "Summary Judgment Motion"); and (2) Plaintiff Alcohol Monitoring Systems, Inc.'s Motion for Partial Summary Judgment of Validity Regarding the '149 Patent (Doc. 135) (the "Validity Motion"), both of which have been thoroughly briefed by the parties.

1

For the reasons discussed below, and exercising jurisdiction pursuant to 28 U.S.C.

§§ 1331 and 1338(a), the Court GRANTS defendants' Summary Judgment Motion and

plaintiff's Validity Motion.

## I.   RELEVANT BACKGROUND

Currently before the Court are the claims of Alcohol Monitoring Systems, Inc.

("AMS") that the BI Incorporated ("BI") BI TAD system infringes AMS's patents, U.S.

Patent Nos. 7,462,149 ("'149"), 7,641,611 ("'611"). [1] AMS's patents both describe

---

[1] Claim 1 of the '149 patent reads as follows (United States Patent No. 7,462,149, Doc. 137-1, Col. 16, l. 51-Col. 17, l. 18):

A system for continuous remote blood alcohol monitoring of a human subject comprising:

> a monitor device adapted to be attached to the human subject, wherein said monitor device takes a plurality of transdermal alcohol concentration readings at predetermined time intervals according to a first schedule stored in a first memory in said monitor device without active participation by the human subject, wherein said plurality of transdermal alcohol concentration readings are stored in said first memory;

> a modem in communication with said monitor device, wherein said plurality of transdermal alcohol concentration readings stored in said first memory are communicated from said monitor device to said modem at predetermined time intervals according to said first schedule through radio frequency signals without active participation by the human subject, wherein said plurality of transdermal alcohol concentration readings are stored in a second memory in said modem;

> a monitor network in communication with said modem, wherein said plurality of transdermal alcohol concentration readings stored in said second memory are communicated from said modem to said monitor network at predetermined time intervals according to a second schedule stored in said second memory through a first communication link without active participation by the human subject, and further wherein said monitor

2

network analyzes said plurality of transdermal alcohol concentration readings to determine if an alert condition exists;

and a supervising agency in communication with said monitor network, wherein said monitor network communicates an alert to said supervising agency through a second communication link when said alert condition exists.

Claim 1 of the '611 patent reads as follows (United States Patent No. 7,641,611, Doc. 137-3, Col. 16, l. 51-Col. 17, l. 18):

A monitor network for use with a modem and a continuous remote blood alcohol monitoring device adapted to be attached to a human subject, the monitor network comprising:

a communication server, wherein said communication server receives raw data over a communication link from the modem, wherein said raw data is gathered by the continuous remote blood alcohol monitoring device adapted to be attached to the subject and transmitted to the modem;

a situation analyzer connectable to said communication server, wherein said situation analyzer parses said raw data through a predetermined set of rules into a plurality of messages;

a workflow instructions connectable to said situation analyzer, wherein said situation analyzer queries said workflow instructions and a historical data relating to similar said plurality of messages for an action to be applied to each of said plurality of messages;

a supervising agency/subject database connectable to said situation analyzer for storing said raw data, for storing information on the human subject, a supervising agency, and a supervising person monitoring the human subject, and for storing a predetermined notification method by said supervising person;

and a notification server connectable to said situation analyzer, wherein when said situation analyzer determines that said action to be applied to one of said plurality of messages requires an immediate notification of said supervising person, said situation analyzer will communicate said one of said plurality of messages to said notification server, and further wherein said notification server queries said supervising agency/subject database to determine said predetermined notification method, and executes said predetermined

3

devices that attach to a person's leg to detect alcohol consumption as indicated by the person's transdermal emissions, along with the associated networks through which such data are transmitted, analyzed, and reported.  BI answered, claiming various affirmative defenses including that the '149 patent was invalid.

At the June 7-8, 2012 Markman[2] hearing , the Court heard argument regarding claim construction of the '149 and '611 patents.  The Court entered an order construing the claims on June 20, 2012 (the "Markman Order," Doc. 117). On August 2, 2013, defendants filed the Summary Judgment Motion and AMS filed the Validity Motion.

The Court now rules on the Summary Judgment Motion and the Validity Motion, having reviewed the record and the applicable law, and having considered the arguments made in the parties' briefs.

## II.   THE SUMMARY JUDGMENT MOTION

Defendants argue that, under the undisputed material facts on the record, the BI TAD system does not infringe the AMS '149 or '611 patents. As explained below, the Court agrees that summary judgment is warranted based on non-infringement.

### A. Legal standards

#### i.   *Summary judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  Parties must "cit[e] to particular parts in the record,"

---

notification method to communicate one of said plurality of messages to said supervising person.

[2] See Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

4

including affidavits or admissions, in order to show the absence or presence of a genuine dispute of fact.  Id. 56(c)(1)(A); see also id. 56(c)(3) ("The Court need consider only the cited materials, but it may consider other materials in the record.").  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Only admissible evidence is considered on motions for summary judgment.  Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).

>  ii.  *Patent infringement*

Two methods of patent infringement are relevant in this case: literal infringement and infringement under the doctrine of equivalents.

>  1.  Literal patent infringement

To determine whether any claim in a patent has been literally infringed "requires a two-step analysis:  First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process."  Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1361 (Fed. Cir. 2007) (citation, internal quotation marks omitted).  In this case, the Court has already construed the meaning of any remaining disputed claims in its Markman Order.  Here, then, the Court need only engage in the second, device-comparing step of the infringement analysis.  To succeed at that second step, "the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement."  Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999).

2.   Patent infringement under the doctrine of equivalents

"Under the doctrine of the equivalents, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 523 F.3d 1304, 1312 (Fed. Cir. 2008). However, "[t]he doctrine of prosecution history estoppel prevents a patent owner from recapturing with the doctrine of equivalents subject matter surrendered to acquire the patent." Id. Thus, if "the court determines that a narrowing amendment has been made for a substantial reason relating to patentability," the court is to presume that "the patentee has surrendered all territory between the original claim limitation and the amended claim limitation." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359, 1367 (Fed. Cir. 2003). In such a case, "if the patentee fails to rebut this Festo presumption, then prosecution history estoppel bars the patentee from relying on the doctrine of equivalents for the accused element." Id. (citing Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722 (2002)).

It is "the patentee [who] bears the burden of showing that a narrowing amendment did not surrender a particular equivalent." Id. at 1368 (citing Festo, 535 U.S. at 741); accord Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293, 1312 (Fed. Cir. 2006). There are three ways to overcome the Festo presumption. Festo, 344 F.3d at 1368 (citing Festo, 535 U.S. at 740-41). Specifically,

the patentee must demonstrate that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent.

Id.

The first way to rebut the presumption, foreseeability, "requires a patentee to show that an alleged equivalent would have been 'unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered.' " Id. (quoting Festo, 535 U.S. at 738). "This criterion presents an objective inquiry, asking whether the alleged equivalent would have been unforeseeable to one of ordinary skill in the art at the time of the amendment." Id. at 1369. Normally, more advanced technology than the one patented will not be foreseeable, whereas existing technology would more likely be foreseeable. Id. The question of foreseeability depends on underlying factual issues such as the understanding of a person of ordinary skill in the art at the time of the patent amendment, so a district court may hear expert testimony. Id.

The second means of rebutting the Festo presumption "requires a patentee to demonstrate that 'the rationale underlying the narrowing amendment [bore] no more than a tangential relation to the equivalent in question.' " Festo, 344 F.3d at 1369 (quoting Festo, 535 U.S. at 740) (alterations in original). The objectively apparent reason for the

narrowing amendment will be discernible from the prosecution history. Id.[3] Thus, the reason for the narrowing amendment may be compared to the equivalent in question.

AMS does not raise the third means to rebut the presumption, the "some other reason" way, and the Court will not further address it.

**B. Analysis of the '149 patent**

The Court determines that summary judgment in favor of defendants is appropriate on the '149 patent because the BI system lacks elements present in the '149 patent. The Court also determines that AMS cannot rely on the doctrine of equivalents to establish infringement because prosecution history estoppel applies.

*i. Literal infringement*

The BI TAD system does not literally infringe AMS's '149 patent because the BI system does not include two of the elements contained in that patent. Those two elements involve the communication of the transdermal alcohol concentration readings ("TAC

---

[3] For example, in a case where the patentee "made it clear that the difference between its process and [that of the alleged infringer] was that its process did not have the disadvantage of the [alleged infringer's] process of a large compressor at the end of the liner" and there was "no indication in the prosecution history of any relationship between the narrowing amendment and a multiple cup process, which [was] the alleged equivalent in th[at] case," the Federal Circuit held that the patentee "successfully rebutted the Festo presumption." Insituform Techs., Inc. v. CAT Contracting, Inc., 385 F.3d 1360, 1370 (Fed. Cir. 2004). In contrast, where claims were initially "rejected as obvious in light of the prior art" and then amended to include a limitation of adjustable inlet guide vanes (IGV) to control airflow to an engine, the Federal Circuit held "[b]ecause the alleged equivalent focuses on the IGV limitation, the amendment bore a direct, not merely tangential, relation to the equivalent." Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 523 F.3d 1304, 1316 (Fed. Cir. 2008). The court therefore held that "[t]angentiality does not help Honeywell overcome the presumption of surrender." Id.

readings") from the monitor device to the modem, and the communication of the data from the modem to the monitor network.

      1.        First disputed element

The first element of the '149 patent that defendants identify as not being present in its BI TAD system is that "said plurality of transdermal alcohol concentration readings stored in said first memory are communicated from said monitor device to said modem at predetermined time intervals according to said first schedule. . . ." The "first schedule" here refers to the schedule from the immediately preceding element of the claim describing the schedule at which the monitor device takes readings from the subject. (United States Patent No. 7,462,149, Doc. 137-1, Col. 16, ll 53-60). Summary judgment is appropriate for defendants here because AMS has not shown that in the BI TAD system, the TAC readings "are communicated" according to a first schedule of predetermined time intervals.

    In the <u>Markman</u> hearing, this Court held that no construction of the above-quoted term was required, and specifically found that the "are communicated" language in the term was affirmative, not permissive, language. The Court's <u>Markman</u> Order rejected AMS's contention that "a first schedule could set forth different sub-schedules for the wearer-to-device communication and the device-to-modem communication—in a way that a single train schedule might be said to contain multiple, unique sub-schedules for specific trains"—because such a construction "lacks a basis in the patent language." <u>Id.</u> at 17-18. The Court further rejected defendants' proposal that "said first schedule" be construed as "same first schedule," reasoning that such a construction was unnecessary

because " 'said first schedule' and 'same first schedule' mean the same thing." Id. Thus, under the '149 patent, the monitor device's TAC readings are communicated to the modem on the same schedule of predetermined time intervals as those readings are taken from the subject by the monitor device. See Markman Order at 17.

Dissimilarly from the AMS system's communication of data from monitor device to modem at predetermined time intervals according to a first schedule, the BI TAD device communicates to the HomeBase (what the BI TAD system calls its modem) only after twelve five-minute periods in which the TAC five-minute averages of one-minute readings show a blood alcohol concentration in excess of 0.02. McAlexander Depo., Doc. 148 p. 38:12-39:6. The shortest period in which the BI TAD device would communicate with the HomeBase is therefore once every sixty minutes, but the communication could be less frequent depending on blood alcohol concentration readings. In sum, BI's event-driven communications of TAC readings to the HomeBase do not occur "at predetermined time intervals according to said first schedule" of the BI TAD device's minute-by-minute TAC readings.

In its Response, AMS essentially argues against the Court's previous Markman Order determination as to claim construction. AMS states that the " 'first schedule' limitation at issue requires only that the same schedule . . . defines both (1) when TAC readings are taken and (2) when TAC readings are communicated from the TAD to the HomeBase." Summary Judgment Response, Doc. 149 at 11-12. AMS states that it "does not contend that separate or sub-schedules are required to find literal infringement" but rather that "the claim requires only that the First Schedule define when the readings and

10

communication occur." Id. AMS similarly argues that the claim references "intervals" in the plural and that "if the same time interval was required [for taking readings and communicating those readings], the language of the claim would require the readings and communication to occur at a predetermined time 'interval.' " Summary Judgment Response at 11. AMS appears to be essentially urging the Court to re-construe this claim term so that the first schedule can encompass any timing arrangement possible, such as the BI TAD's event-driven communications to the HomeBase, which would render BI an infringer. Id.[4]

The Court rejects these arguments because it has already construed "predetermined time intervals according to said first schedule" to require no construction because the meaning of the claim language was clear. If the Court had believed that AMS's interpretation was possible, it would not have rejected AMS's argument of multiple sub-schedules or found that "same first schedule" added nothing to "said first schedule." Additionally, the Court concludes that the language of the claim does not require the word "interval" to be used in the singular and that the use of "predetermined time intervals" in the plural is appropriate for describing that the TAC readings taken by

---

[4] AMS states that in the Markman Order, the Court "refused" to accept BI's limitation that "the pass-through of readings, from wearer to device to modem, is a single sequence (one that is not simultaneous, but is uninterrupted) triggered by the same points in time under a single first schedule" because it failed "to develop the true meaning of the term beyond the current language, which is clear." Summary Judgment Motion at 10 (quoting Markman Order at 17). The reason why the Court needed no further development of the term was that the Court determined that " 'said first schedule' and 'same first schedule' mean the same thing." Based on the claim language, the Court held that no construction was needed, and the Court concludes now that the claim supports summary judgment for defendants.

the AMS monitor device "are communicated" according to the first schedule in which there will be intervals of a predetermined length between communications. Under the Court's construction, in order to infringe, the BI TAD device would have to transmit the TAC readings to the HomeBase according to the "same" first schedule of predetermined time intervals that it uses to take the TAC readings from the subject. See Markman Order at 18. The BI TAD device does not do this, thus, it does not literally infringe.

AMS also states that said first schedule must be read to permit different time intervals for communications between the monitor and the modem because "it is not possible to both take and communicate the readings at the same time." Summary Judgment Response at 11. But, although data read and communicated on the same first schedule may not happen truly "at the same time," such a reference to the first schedule in both elements of the claim can allow for the tiny immediate delay of processing and still be on the same first schedule. Cf. Paragon Solutions, LLC v. Timex Corp., 566 F.3d 1075, 1089 (Fed. Cir. 2009) ("The specification's references to "instantaneous" feedback do not preclude some delay to allow for the processing limitations of the system and the time required to accurately measure the data that is to be displayed.")

Finally, BI's Hello Timer does not cause the TAD device to communicate according to the "said first schedule" of predetermined time intervals on which the TAD device takes readings from the subject. In the Markman Order, this Court rejected that "a first schedule could set forth different sub-schedules for the wearer-to-device communication and the device-to-modem communication." Markman Order at 17. BI TAD transmissions occurring every four hours on the Hello Timer do not have the same

intervals as the schedule over which the TAD device takes TAC readings from the subject.

The Court concludes that, viewing all material facts in the light most favorable to AMS, it has not brought forward evidence to show that in the BI TAD system "said plurality of transdermal alcohol concentration readings stored in said first memory are communicated from said monitor device to said modem at predetermined time intervals according to said first schedule" because the BI TAD device does not communicate with the HomeBase according to the first schedule of predetermined time intervals.

### 2.     Second disputed element

The second element of the '149 patent that BI identifies as not being present in its BI TAD system is the "monitor network in communication with said modem, wherein said plurality of transdermal alcohol concentration readings stored in said second memory are communicated from said modem to said monitor network at predetermined time intervals according to a second schedule stored in said second memory . . . ." Summary judgment is appropriate for defendants here because AMS cannot show that the BI TAD system also features a modem communicating to a monitor network "at predetermined time intervals according to a second schedule." AMS does not present evidence to show that any communication between the BI HomeBase and the BI "Central Monitor Network" (what BI refers to as the "Host" in its Motion) happens according to "predetermined time intervals." As BI points out, the "HomeBase simply transmits to the

13

Host any TAC data it receives immediately upon receipt from the TAD." Summary Judgment Motion at 18.[5]

AMS contends that, like the AMS modem and monitor network, the BI TAD system also features a HomeBase where TAC readings are communicated to the Central Monitor Network. Summary Judgment Response at 13. According to AMS, the BI system's communication from HomeBase to Central Monitor Network is triggered by a software loop running continuously "that identifies that the HomeBase has received data, confirms receipt of the complete set of data, and then opens a second communication link with the Central Monitor Network"—communication "that necessarily occurs at predetermined time intervals according to a second schedule." Id.

As a preliminary matter, defendants are correct that AMS's expert Mr. McAlexander improperly introduced a new theory in his deposition that was not present in his expert report. See Fiber Optic Designs, Inc. v. New England Pottery, LLC, 262 F.R.D. 586, 595 (D. Colo. 2009). However, defendants did not object at the time of the deposition or in a timely manner afterwards to this new theory as they should have, see Foreman v. Am. Road Lines, Inc., 623 F.Supp.2d 1327, 1330 (S.D. Ala. 2008), and in any case, Mr. McAlexander's theory is not persuasive. AMS's evidence does not create a

---

[5] This Court previously rejected AMS's proposed construction changing "are communicated" to "may be communicated" because the '149 language requires that the modem will communicate with the monitor system on a second schedule even if it also communicates when an alert condition exists.

genuine dispute about whether the TAC readings "are communicated from said modem to said monitor network at predetermined time intervals according to a second schedule."

Mr. McAlexander stated that the BI system's intervals for communicating from the HomeBase to the Central Monitor Network are predetermined because "there is a specific amount of time that's associated with processing the instructions." McAlexander Depo., Doc. 148 p. 63:17-18. However, Mr. McAlexander also stated that "there is some variance in [the interval] because you're dealing with hardware and systems and communication." Id. 64:1-3. This Court concludes that software running in a continuous loop to look for and transfer data is distinguishable from a system in which predetermined time intervals control the transfer of data. For example, a bus system running in a continuous loop around a certain route does not run on predetermined time intervals the way the bus system in the city where this Court is located does. Here, buses arrive pursuant to a predetermined and known schedule, and the buses occasionally wait extra time at certain stops if they are running ahead of schedule so that they will conform to the schedule. Cf. Pause Tech., LLC v. TiVo, Inc., 419 F.3d 1326, 1333-34 (Fed. Cir. 2005) (finding that where a claim specified a "time interval of predetermined duration" that "[b]y arguing that the time interval can vary after the determination is made . . . [appellant] attaches no significance to the word predetermine " (internal quotation marks omitted)).

AMS further argues that the BI device communicates according to a schedule because "the Central Monitor Network will communicate to the HomeBase every four hours in the absence of communication from the HomeBase" to "confirm the equipment

is functioning properly." Summary Judgment Response at 13 (citing Bloemendaal Depo., Doc. 148-1 p. 63:9-64:3.) Given that such a communication is not a communication of "said plurality of transdermal alcohol concentration readings stored in said second memory," the BI TAD system cannot be said to infringe this element of AMS's claim because of this periodic hardware check-in function. Thus, the BI system lacks AMS's element that the TAC readings are communicated "from said modem to said monitor network at predetermined time intervals according to a second schedule." With no literal infringement of either the first or the second element of claim 1, the Court concludes that the BI TAD system does not literally infringe the '149 patent.

ii. *Infringement under the doctrine of equivalents*

After examining the prosecution history, the Court further concludes that AMS also cannot rely on the doctrine of equivalents to establish infringement. AMS made substantive narrowing amendments to the claims of the '149 patent to secure patentability after the PTO rejected AMS's earlier application (Response to Office Action (After Final), Doc. 137-11 p. 39-40 ("The Examiner has rejected [claim 1] . . . In response, . . . Applicant has also amended independent [claim 1] to more distinctly distinguish Applicant's invention through the further limitation . . . .).) It is presumed that AMS has surrendered all the territory between the original claim and the amended claim, and AMS is presumptively estopped from making use of the doctrine of equivalents by prosecution history estoppel. See Festo, 344 F.3d at 1366-67. AMS had the opportunity to rebut the presumption by showing that the allegedly infringing device was either

unforeseeable or was only tangentially related to the narrowing amendment, but, for the following reasons, the Court determines that AMS failed to do so.

First, AMS has not shown that the BI TAD device was unforeseeable at the time of AMS's amendment as relates to Claim 1. AMS states that it was unforeseeable that "BI would develop the TAD system that stored TAC data from a monitoring device on the HomeBase and then transmitted that data to the Central Monitoring Network as the TAD system does." Summary Judgment Response at 16. [6] AMS further argues, without citation, that "[a]t the time, what existed in the prior art were pass-through systems, where the modem neither stored data nor separately controlled when data would be transmitted to a host monitor network." Id. AMS provides no evidentiary support, such as citation to expert testimony for these assertions. But to rebut the Festo presumption by showing the unforeseeability of the infringing device, the party with the burden must introduce evidence on the foreseeability issue. See Festo, 344 F.2d 1359, 1371 (remanding to district court so that parties could introduce evidence on disputed factual issue of foreseeability); cf. Honeywell, 523 F.3d 1304, 1314 (relying on expert witness testimony and other parts of the record introduced by both parties to determine that the infringing device was foreseeable). "The district court [i]s not obligated to comb the record in order to make [a plaintiff's] arguments for him." Mitchell v. City of Moore, Oklahoma, 218 F.3d 1190, 1199 (10th Cir. 2000).

---

[6] The Court notes that BI's statement of facts characterizes the communication from HomeBase to the Host as immediate, and does not mention storage on the HomeBase. Summary Judgment Motion at 9. However, the Court will assume for the purposes of summary judgment that there is a brief element of storage in the Modem, as AMS contends. Such an assumption is not material to this matter.

Further, in the present case the record shows that the prior art at the time of amendment included the Philips system's storage of data on the monitor attached to the subject's body, which strongly suggests the feasibility and foreseeability of a design where data was stored on a modem such as the BI HomeBase before being transferred to a central network. (Response to Office Action (After Final), Doc. 137-11 p. 43.) Thus, in the absence of evidence to the contrary, and with evidence suggesting that a person skilled in the art would have foreseen BI's system, AMS cannot rely on unforeseeability to rebut the presumption of estoppel.

As for AMS's second opportunity to rebut the presumption of prosecution history estoppel—the tangential relationship method—AMS's arguments that its narrowing amendment bears only a tangential relationship to the BI TAD equivalent is directly refuted by the prosecution history. AMS asserted in its narrowing amendments that the '149 patent was patentable and non-obvious because of its advantage over the prior art. Response to Office Action (After Final), Doc. 137-11 p. 44.) AMS explicitly distinguished its advance from the prior art of Karz in part because "[t]he system of Karz also does not take readings at predetermined time intervals according to a schedule." Id. Although, as AMS asserts, AMS's system also improved on the prior technology in ways tangential to this particular equivalent, for example, by storing the data on the subject's monitor and then communicating when the subject was in range of the modem without action by the human subject, this amendment was drafted to directly focus on the measurements being taken at a schedule of predetermined time intervals. See id. When the narrowing amendment is directly responsive to the subject matter over which the

infringer allegedly infringes, and is not merely tangentially related to the infringing art, the presumption is not rebutted and prosecution history estoppel applies. See Honeywell, 523 F.3d at 1316.

### iii.    Conclusion regarding the '149 patent

The Court concludes that summary judgment for defendants is appropriate on the '149 patent because the BI system does not literally infringe on the patent and the doctrine of equivalents is not available to AMS.

## C.  Analysis of the '611 patent

### i.    Literal infringement

Defendants claim that the BI system cannot literally infringe on the '611 patent because the BI system lacks the characteristic of the AMS system "wherein said situation analyzer queries said workflow instructions and a historical data relating to similar said plurality of messages for an action to be applied to each of said plurality of messages . . . ." Summary judgment is appropriate for defendants here because AMS has not show that in the BI system, a "situation analyzer queries . . . a historical data relating to similar said plurality of messages for an action to be applied. . . ."

For the BI system to infringe on '611 patent, the BI system would have to possess a situation analyzer that would use historical data relating to prior messages in deciding what action to apply to the incoming message just received. See Markman Order at 26.[7]

---

[7] The parties resolved the meaning of "historical data" after the Markman hearing, and the Court noted the definition in its Markman Order. The term was construed as meaning "data relating to prior messages, as opposed to data relating to the message just received by the situation analyzer." Markman Order at 25.

The defendants acknowledge that the TAD Processor in their BI system does fulfill part of the role of the AMS situation analyzer, as defendants' Summary Judgment Motion admits. Summary Judgment Motion at 19 ("[T]he BI Host arguably possesses a 'situation analyzer' in the form of the TAD Processor.") The TAD Processor "analyzes a cluster of the most recent 5-minute [TAC] averages using an algorithm to determine whether the data constitutes an alcohol event." ((Expert Report of Ruth H. Dameron, Doc. 137-8 ¶ 62.) However, as the BI TAD Processor does not decide what action to apply to an event, a function filled by the BI AutoAlertHandler, the BI TAD Processor does not meet the claim limitation of the '611 patent's situation analyzer. (Id. ¶ 64 ("[t]he processor within the Host that determines what action to apply to each event is called the AutoAlertHandler.").)

The AutoAlertHandler likewise cannot fulfill the role of the situation analyzer, as unlike the situation analyzer in the AMS device, which parses raw data and queries workflow instructions and historical data, Ms. Dameron stated that "[t]he AutoAlertHandler is not involved in determining whether a particular set of data constitutes an event . . . ." (Id. ¶ 64.) Ms. Dameron's report states that the AutoAlertHandler's "function is to follow a set of rules to decide what to do with each event that has been placed in the event table" by the TAD Processor. (Id. ¶¶ 62, 64.) To infringe, the BI system would have to contain a situation analyzer that queries historical data to decide on an action to apply to the messages, and Ms. Dameron's testimony establishes that the BI system's TAD Processor and AutoAlertHandler, which are separate components, each lack this combination of functions.

In response to defendants' argument, AMS presents no evidence on whether the BI system includes a situation analyzer that decides which action will be applied to any given message. AMS's argument relies on the contention that the BI system's MAD6 is historical data, and that the BI system uses that data to determine whether an alert message exists. Even granting AMS that premise, the Court finds that AMS has not shown that this data is used to determine an action to apply to the alert messages. AMS did not dispute defendants' characterization of the BI TAD System's separation between the component that creates an alert event and the component that decides which action to apply to that alert event. Thus, here, as a matter of law AMS cannot "show that the accused device contains every limitation in the asserted claims." Elkay, 192 F.3d at 980.

    *ii.    Infringement under the doctrine of equivalents*

Defendants argue that AMS may not use the doctrine of equivalents as grounds for infringement because the historical data element was added to the claims for patentability. Summary Judgment Motion at 20. Defendants also assert that AMS's attorney has admitted that AMS amended the claims for patentability purposes. Id. at 6. AMS does not dispute this argument that the doctrine of equivalents is not available, does not dispute defendants' assertions of fact, and does not make an argument for defeating the presumption that prosecution history estoppel applies to this claim. Summary Judgment Response at 2 (noting that "AMS does not dispute BI's Statement of Facts" as regarding this aspect of the '611 patent's prosecution history). Therefore, no genuine dispute of material fact exists and the Court finds the doctrine of equivalents is not available to AMS on the '611 patent.

The Court concludes that summary judgment for defendants is appropriate on the '611 patent because the BI system does not literally infringe on the patent and the doctrine of equivalents is not available to AMS.

## III.   THE VALIDITY MOTION

The Court has discretion about whether to reach the affirmative defense of invalidity raised by defendants. Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1481 (Fed. Cir. 1998) (holding that after all claims and counterclaims were decided or withdrawn, the district court acted properly when it "recognized that it could, in its discretion, decide this affirmative defense, but chose not to do so, citing Fed.R.Civ.P. 8(c)"). Nevertheless, the appellate court "stress[ed] the useful general rule that trial courts should decide all litigated issues, in the interest of finality." Id. Accordingly, the Court turns to the Validity Motion (Doc. 135).

The parties in this litigation agree that "partial summary judgment is appropriate." Validity Motion Response, Doc. 143, at 6. Defendants state that "BI will not present any evidence solely directed to the invalidity of the '149 Patent at trial" and that "[t]he differences in the district court and PTO proceedings require that reexamination proceeding be allowed to continue even if summary judgment is granted on BI's defense." Id. at 4-5.

Defendants are correct that this Court's grant of summary judgment against them on their affirmative defense of invalidity will not impact the re-examination proceedings before the PTO, see In re Baxter Int'l, Inc., 678 F.3d 1357, 1364 (Fed. Cir. 2012), which defendants are free to continue despite that this Court has granted their Summary

22

Judgment Motion. In light of the judicial system's interest in finality and defendants' concession that summary judgment is appropriate because "BI agrees that it will not present evidence in this Court sufficient to meet its burden of proving invalidity by clear and convincing evidence," Validity Motion Response at 7, the Court concludes that granting AMS partial summary judgment on the affirmative defense of invalidity is appropriate.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' Summary Judgment Motion and GRANTS plaintiff's Validity Motion.  The Trial Preparation Conference scheduled for April 14, 2014, and the Jury Trial scheduled to commence on April 21, 2014, are VACATED.   It is so ORDERED.

DATED this 19th day of December, 2013.

BY THE COURT:

*s/ David M. Ebel*

_____

U.S. CIRCUIT JUDGE